# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARCIA JEMMOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00486** |
| | ) | **Judge Aleta A. Trauger** |
| **DENIS McDONOUGH, Secretary of the** | ) | |
| **Department of Veterans Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment filed by the defendant, Denis McDonough, the Secretary of the Department of Veterans Affairs (Doc. No. 43), seeking judgment in his favor on the sole remaining claim in this case: plaintiff Marcia Jemmott's claim that the termination of her employment with the Veterans Benefits Administration was in retaliation for her having engaged in activity protected by Title VII of the Civil Rights Act of 1964 ("Title VII"). For the reasons set forth herein, the motion will be granted.

## I.    PROCEDURAL BACKGROUND

The plaintiff, then represented by counsel, filed suit in this court in June 2021, asserting claims for disability discrimination and failure to accommodate a disability in violation of the Rehabilitation Act ("RA"), as well as a Title VII retaliation claim. In response, the defendant filed a Partial Motion to Dismiss or, alternatively, for Partial Summary Judgment (Doc. No. 17), supported by a substantial quantity of evidentiary material. The court declined to consider the motion as a summary judgment motion under Rule 56 and, therefore, did not consider the materials outside the pleadings submitted by the defendant. The court nonetheless found that the Complaint failed to state a claim under the RA for which relief may be granted and dismissed both the

disability discrimination claim and the failure to accommodate claim. (Doc. Nos. 28 (Memorandum), 29 (Order).) The court granted the defendant's motion in its entirety, leaving for resolution only the plaintiff's claim that the termination of her employment was in retaliation for her having engaged in activity protected by Title VII.

Following the close of discovery, counsel for the plaintiff was permitted to withdraw, and the plaintiff has elected to proceed *pro se* since then. (*See* Doc. Nos. 36–38.)

The defendant filed his Motion for Summary Judgment, supporting Memorandum of Law, deposition excerpts and other evidentiary material, and his Statement of Undisputed Facts ("SUF") on June 23, 2023. (Doc. Nos. 43–46.) The motion also cites and relies on several affidavits prepared and filed in 2021 in support of his Motion to Dismiss. (Doc. Nos. 20–23.) The defendant argues generally that the plaintiff cannot establish that her termination was retaliatory, because she cannot show that the relevant decision-makers knew that she had engaged in protected activity or that her termination was causally connected to that protected activity. He also argues that, even if she could establish a *prima facie* case of retaliation, she cannot show that the defendant's proffered explanation for her termination is pretextual.

The plaintiff filed various responsive documents, including her own "Statements of Undisputed Facts in Opposition to the Defendant's Statements for Summary Judgment" (Doc. No. 48), which appears to be intended as a response to the defendant's SUF. The plaintiff's responses, however, do not clearly state whether she does or does not dispute the defendant's factual statements and are not supported by any citations to the factual record.

Similarly, the plaintiff's Opposition in Response to the Motion for Summary Judgment does not actually address the defendant's arguments and closes by asking the court to "order the Defendant to produce supporting documents to support their decision." (Doc. No. 49, at 7.) Her

second response, styled "Opposition to Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment," insists that the defendant has misrepresented the record by filing only excerpts from Benesch's deposition transcript; that the investigation into the complaint against Becnel-Taylor was biased and that she herself was denied a reasonable accommodation; that her termination was in violation of the Master Agreement Between the Department of Veterans Affairs and the American Freedom of Government Employees (*see* Pl.'s Ex. C., Doc. No. 51, at 8–10); that she requested to be reassigned to another team "due to the hostile working environment" created by Benesch, but she was fired instead; and that Benesch's unfair treatment of her is evidence that she was terminated for engaging in protected activity. (*See generally* Doc. No. 50.)[1] She asserts that she has stated a *prima facie* case of retaliation and that the defendant has not articulated a legitimate reason for her termination. (*Id.* at 6.)

## II.    STANDARD OF REVIEW

### A.    Rule 56

In resolving a motion for summary judgment, the court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1] The plaintiff also states that she has never received a copy of her deposition transcript. The plaintiff has filed an email exchange between her and her former attorney that took place in July 2023, when the plaintiff was responding to the defendant's summary judgment filing, requesting a copy of her deposition transcript. Her attorney responded on July 12 that his office had not received a copy but that he would contact the court reporter and "pass on the transcripts as soon as we receive them." (*See* Doc. No. 50, at 2.) As of July 15, 2023, the date indicated on the postage on her filings, she had apparently not heard back from her attorney. The defendant filed excerpts from the plaintiff's deposition transcript in support of his motion, and the plaintiff does not assert that she was in any way disadvantaged in her briefing by not having access to a full copy of the transcript.

250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); s*ee also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence

in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

### B. Local Rule 56.01

This court's Local Rule 56.01 provides that a motion for summary judgment "must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Local Rule 56.01(b) exists "'to prevent parties from unfairly shifting the burdens of litigation to the court,'" *Matthews v. Copeland*, 286 F. Supp. 3d 912, 916 (M.D. Tenn. 2017) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)), and to ensure that a party facing a motion for summary judgment has adequate notice of, and an opportunity to respond to, the movant's claim that certain facts are undisputed. "Each fact must be set forth in a separate, numbered paragraph . . . [and] be supported by specific citation to the record." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). The movant must insert the word "response" after each numbered paragraph and allow the nonmoving party "sufficient space to respond to the assertion that the fact is undisputed." *Id.*

"The requirement that a statement of undisputed material facts in the described format must accompany any motion for summary judgment applies to *pro se* parties." *Id.*; *see also Matthews*, 286 F. Supp. 3d at 915 (finding that "'it is incumbent upon litigants, even those proceeding *pro se*, to follow the . . . rules of procedure,' and this includes 'local and state court rules'" (alteration in original) (quoting *Fields v. Cty. of Lapeer*, No. 99-2191, 2000 WL 1720727, at *2 (6th Cir. Nov. 8, 2000))). A party opposing a motion for summary judgment must respond to each asserted fact by

(1) Agreeing that the fact is undisputed;

    (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or

    (3) *Demonstrating* that the fact is disputed. Each disputed fact must be supported by specific citation to the record.

M.D. Tenn. R. 56.01(c) (emphasis added). A failure to file a timely and compliant response to a statement of undisputed fact generally means that the defendant's asserted facts will be deemed undisputed for purposes of summary judgment. M.D. Tenn. R. 56.01(f);

## III.   FACTS

    The defendant in this case filed a statement of facts that complies with Federal Rule of Civil Procedure 56(c)(1) and with Local Rule 56.01. The plaintiff has filed a response, but it does not comply with either the local or federal rules. In this circumstance, while Local Rule 56.01(f) requires the court to consider as true any asserted undisputed fact to which no adequate response has been given, the party moving for summary judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact," irrespective of whether the "adverse party fails to respond." *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991); *see also F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) ("The court . . . may not grant Plaintiff's unopposed motion for summary judgment without conducting its own, searching review. Even where a party offers no timely response to a motion for summary judgment, the District Court may not use that as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." (brackets, quotation marks, and citations omitted)). In other words, because the defendant always bears the burden of proving that it is entitled to summary judgment, the court must examine the evidence offered by the defendant in support of his motion to determine if it is sufficient to satisfy his initial summary judgment burden with respect to Jemmott's claim before evaluating Jemmott's response. *See Adickes v. S.H. Kress*

& *Co.*, 398 U.S. 144, 160 (1970)).) With that standard in mind, the court finds the following facts to be undisputed on the present record.

Jemmott is a veteran who served in the U.S Army and the Army Reserves. (Doc. No. 44-1, Jemmott Dep. 28, 35.[2]) After she left the Army in 2019, her first job was with the Veterans Administration ("VA"). (*Id.* at 36.) She applied, was interviewed, and was hired by the VA as a Veterans Service Representative ("VSR") in August 2019. (*Id.* at 57–58.)

As a VSR, the plaintiff was responsible for processing veterans' disability claims. (*Id.* at 58.) As the plaintiff explained, the veterans would submit claims online, and the VSR would collect all the relevant data from the veteran and the veteran's military and other records pertaining to the disability claim and then "move the claim forward" to a Rating Veteran Service Representative ("RVSR"). (*Id.* at 58–60.) The VSR would then hand over all of the data to the RVSR to make a final decision on the claim. (*Id.* at 59–60.)

The plaintiff was hired on a probationary basis. (Doc. No. 20, Benesch Aff. ¶ 16; Doc. No. 22, Kraft Aff. ¶ 18; Doc. No. 23, Peterson Aff. ¶ 18.) The plaintiff understood that she was hired on a probationary basis and that the probationary period was used to "assess whether [the probationary employee] was a good fit" for the position. (Jemmott Dep. 60.) She was initially engaged in a training period from August 2019 until April 1, 2020. (*Id.* at 61.) Ten employees, including Jemmott, were on her training team. (*Id.* at 64–65.) Adonis Rouse was one of these. (*Id.* at 64.)

On or about February 27, 2020, Rouse, and later Jemmott and at least one other member of the plaintiff's team, walked past a supervisor's door. The supervisor, Adrienne Becnel-Taylor,

---

[2] The defendant has filed excerpts rather than complete deposition transcripts. The court refers herein to the depositions by their original pagination rather than the page numbers assigned by the court's electronic filing system.

asked both Rouse and Jemmott not to walk past her office door. (Doc. No. 1, Compl. ¶¶ 10–11; Jemmott Dep. 67–69.) Jemmott testified that Becnel-Taylor "yelled at [her] and told her not to walk in front of her office. . . . She was like, . . . I'm going to tell you like I told the rest of them, don't walk in front of my office. You guys walk back and forth in front of this office all day, which tells me you don't have enough work to do." (Jemmott Dep. 67–68.) The plaintiff tried to explain to Becnel-Taylor that she was disabled, but Becnel-Taylor told her she "d[id]n't want to hear it." (*Id.* at 69.)

The plaintiff had never formally met Becnel-Taylor, had never had a work-related conversation with her before this incident (*id.* at 68), and had no direct working relationship with her (Doc. No. 21, Becnel-Taylor Aff. ¶ 8).

The plaintiff did not formally complain about Becnel-Taylor's conduct, but her coworker Adonis Rouse did. (Compl. ¶ 12; Jemmott Dep. 69.) Rouse alleged that Becnel-Taylor "created a hostile work environment by instructing several trainees to take an alternate route to the restroom without explanation and responded rudely when questioned," and the VA investigated this complaint. (*See* Doc. No. 46-1, Mustian May 13, 2020 Report of Facts and Findings ("Mustian Report").) Jemmott was interviewed in connection with this investigation. (*Id.* at 2–3; Doc. No. 44-3, Jemmott March 3, 2020 Fact-Finding Questionnaire; Jemmott Dep. 73.) At the conclusion of the investigation, Rouse's hostile work environment claim was deemed not to be substantiated. (Mustian Report 4.)

On or about April 1, 2020, when the training period expired, the plaintiff was assigned to a team supervised by James Benesch. (Jemmott Dep. 84.) Benesch worked as a Supervisory Veteran Service Representative Coach. (Benesch Aff. ¶ 4.) He first met Jemmott when she was assigned to his team. (Doc. No. 44-4, Benesch Dep. 101.) At the time, Benesch reported to two

separate Assistant Veteran Service Center Managers, one of whom was Becnel-Taylor. (Benesch Aff. ¶ 20.) At the end of April, however, Becnel-Taylor was moved into a different position and was no longer in Benesch's line of supervision. (Becnel-Taylor Dep. 10.)

For approximately one week after being assigned to Benesch's team, the plaintiff worked physically in the office. In early April 2020, however, Jemmott and her entire team began working remotely due to the COVID-19 pandemic. (Jemmott Dep. 87.) As a result, she had no personal interaction with Benesch. (*Id.* at 88.) Instead, they interacted "virtually" while on mandatory telework. (Benesch Aff. ¶ 8.)

Jemmott's computer profile was initially misconfigured, which disrupted her ability to work effectively from home for approximately two weeks during April and resulted in poor production numbers for that month. (Compl. ¶ 16; Jemmott Dep. 111–13.) Although her monthly performance report for April 2020 was otherwise excellent, Jemmott failed to meet the "fully successful" threshold of 94.88 claims processed, instead processing only 41 claims. (Doc. No, 44-5, at 2.) Benesch, however, told the plaintiff that her April production numbers would not count against her, given the computer problems. (*See id.* (noting in the "Comments" section of the April Performance Review: "Marcia, we acknowledge there were technology issues during the month of April that excluded you from production! However, since May 1, 2020, you are significantly behind in output."); *see also* Jemmott Dep. 114.)

The misconfiguration problem was resolved, but Jemmott continued to complain about computer issues, such as applications closing and freezing, requiring her to reset or restart her computer several times a day. (Jemmott Dep. 112–13.) In May, she requested that she be issued a different computer, but Benesch told her "there's a process involved," and the request apparently was never acted upon. (*Id.* at 130–31; Compl. ¶ 18.)

In May 2020, Jemmott again failed to meet the fully successful level of output performance, processing 140 claims, or 17.75 fewer than the 157.75 required to be "fully successful." (Benesch Aff. ¶ 12; Doc. No. 44-6, May 2020 Performance Review.) Benesch noted in the "Comments" section that the plaintiff was "below standard by 17.75 [for May] and 39.11 below full successful FYTD20" and that "[c]oncern is communicated" about this shortfall. (May 2020 Performance Review.)[3]

Jemmott alleges that she was being assigned more complex claims while other employees were assigned easy claims that could be resolved quickly. (Compl. ¶ 20; Jemmott Dep. 121–23.) She requested that she be assigned "a combination of claims so that [she] would be able to make [her] numbers, as [her] peers were doing." (Jemmott Dep. 123.) However, she offers no actual evidence that the type of claims her peers were working on was different from hers. She admits that she had "some" of the easier "AWARDS" claims assigned to her in May, but "very few." (*Id.*)

In June, Jemmott met the monthly performance standard, having processed 181 claims, or 10.06 more than the 170.94 required to be "fully successful." (Doc. No. 44-7, June 2020 Performance Review.) Her supervisor, however, communicated to her that she "remain[ed] below the fully successful output by 47.29 prorated work credits" and that "concern was communicated." (*Id.*)[4]

---

[3] Although the plaintiff claims that Benesch told her April's numbers would not count against her, the numbers reflected in her May 2020 Performance Review suggests that her "FYTD20" performance standard was adjusted by 32.52 claims, but that the shortfall in excess of that number (21.36 claims) was counted against her.

[4] The supervisor's statement that she was behind by 47.29 prorated work credits conflicts with the "Below by 39.11" stated in the FYTD Performance section, but that number appears to have been copied and pasted from the May 2020 Performance Review. In any event, neither figure makes any sense, because Jemmott exceeded that month's expectation by 10.06 claims. As a result, if her tally for April actually was adjusted by 32.52 claims in recognition of her computer problems that month, as indicated in the May 2020 Performance Review, then her year-to-date

On July 8, 2020, Jemmott requested to be moved to a different team. (Doc. No. 44-8.)

Travis Kraft was Acting Director of the VA Regional Office in Nashville at the time of the plaintiff's employment. (Doc. No. 22, Kraft Aff. ¶¶ 2, 4.) He was not Jemmott's direct supervisor; he was her "6th-line supervisor." (*Id.* ¶ 7(b).) As such, he was the "Deciding Official" with regard to the termination of her employment during her probationary period. (*Id.* ¶ 14.) He signed off on the Memorandum dated July 10, 2020 providing "justification of [her] termination during her probationary period due to performance deficiencies." (*Id.* ¶ 16.) Kraft, in making the termination decision, acted upon the recommendation of Acting Veterans Service Center Manager Shelly Peterson. (*Id.* ¶ 19.)

Shelly Peterson states in her Affidavit that she was not the plaintiff's direct supervisor but, as Acting Veterans Service Center Manager, was in the plaintiff's chain of command. (Peterson Aff. ¶¶ 4, 7.) According to Peterson, she met with Kraft and HR Specialist Darlene Wiggins on July 8 or 9, 2020 to discuss the termination of Jemmott during her probationary period and made the decision to terminate her "for failure to qualify during the probationary/trial period due to not meeting the Fully Successful level of the VSR Performance Standard." (*Id.* ¶¶ 19, 21.) Kraft signed the termination Memorandum and Peterson issued it to Jemmott on July 10, 2020. (*Id.* ¶ 20; *see also* Doc. No. 44-9, Termination Memorandum.)

Becnel-Taylor had no involvement in the plaintiff's termination. (Becnel-Taylor Aff. ¶ 12.)

The plaintiff has no proof that Benesch knew that she had been interviewed in connection with Rouse's complaint, but she believes that he did, "based on . . . his treatment" of her and based on the fact that Becnel-Taylor was his direct supervisor. (*Id.* at 85, 86.) Benesch testified that, at

---

shortfall at the end of June should have been *less* than it was in May by approximately 10 claims, not more. Neither party addresses this discrepancy.

the time he was supervising Jemmott and through the date of her termination, he did not know that she had participated in the investigation into the complaint against Becnel-Taylor; he did not learn about that process until discovery in this case. (Benesch Dep. 102.)

On July 24, 2020, the plaintiff contacted a counselor with the Equal Employment Opportunity Commission ("EEOC"), and she submitted a formal administrative complaint on November 2, 2020, alleging retaliation for her participation in the investigation of Rouse's complaint (among other claims). (*See* Doc. No. 18-1.) She alleged that Benesch treated her unfairly because of her involvement in the investigation of Rouse's complaint against Becnel-Taylor. (*Id.* at 2–3.) The VA issued a Final Agency Decision ("FAD"), finding no discrimination or retaliation, on April 26, 2021. (Doc. No. 46-2.) The plaintiff filed this lawsuit shortly thereafter.

## IV. ANALYSIS

### A. Title VII Retaliation—Legal Standards

The only claim remaining in this action is the plaintiff's claim that she was retaliated against for engaging in activity protected by Title VII when she participated in the investigation of Adonis Rouse's claim that Becnel-Tayler had created a hostile work environment. Title VII prohibits an employer from discriminating or retaliating against an employee for having "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). The plaintiff concedes that she does not have direct evidence of retaliation. Accordingly, her claim is analyzed "under the familiar *McDonnell Douglas* burden-shifting framework." Kenney, 965 F.3d at 448 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

Under this framework, the plaintiff must first point to "evidence sufficient to convince a jury that: (1) she engaged in activity protected under Title VII; (2) [the defendant] knew that she

exercised her protected rights; (3) an adverse employment action was subsequently taken against her; and (4) [the plaintiff's] protected activity was the but-for cause of the adverse employment action." *Id.* (citations omitted). If, and only if, the plaintiff is able to establish a *prima facie* case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for its action. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant makes the requisite showing, the plaintiff then has the burden of demonstrating that the defendant's "proffered reason was a mere pretext for discrimination." *Id.*

The defendant in this case challenges two of the four elements of the plaintiff's *prima facie* case. He argues that the plaintiff cannot show either that the relevant decision-makers had knowledge of her protected activity or that she has evidence sufficient to establish a causal connection between her protected activity and her termination. He also argues that, even if the plaintiff could establish each element of a *prima facie* case of retaliation, she cannot show that the legitimate, non-retaliatory reason proffered by the defendant for her termination was pretext for retaliation.

As set forth below, the court finds that the plaintiff has not established a *prima facie* case and, therefore, does not reach the defendant's remaining arguments.

### B.     The Plaintiff Cannot Establish a *Prima Facie* Case

Although the second factor of the *prima facie* case is usually framed in terms of whether the "defendant" knew about the protected activity, the Sixth Circuit has recognized that the plaintiff must produce some evidence that the relevant decision-makers who engaged in the adverse actions knew about the protected activity when they made the actionable decisions. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999); *see also Brown v. City of Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) ("[O]ne necessary element of the *prima facie* case is that the official committing the adverse action have knowledge of the protected activities." (citing *Barnett v. Dep't*

*of Veterans Affs.*, 153 F.3d 338, 343 (6th Cir. 1998)). Direct evidence of such knowledge is not required; circumstantial evidence may suffice. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). The plaintiff, however, must offer more than speculation and "conspiratorial theories" to establish an inference of knowledge. *Id.*

The undisputed evidence is that in July 2020, Travis Kraft, Acting Director of the VA Regional Office in Nashville at the time of the plaintiff's employment, decided to terminate Jemmott based on her performance. Kraft testified that he met with Shelly Peterson, Acting Veterans Service Center Manager, and Petersen recommended that Jemmott be terminated.

Jemmott insists that her direct supervisor, Benesch, was the individual actually responsible for her termination, and she speculates that he knew about her protected activity because he was "short" and "snappy" with her, but "pleasant" with others, and because Becnel-Taylor was his direct supervisor. (*See* Jemmott Dep. 86, 88.) In her "Response" to the defendant's SUF, she also asserts that Benesch must have known, because he had no other reason to be "combative" with her or to deny her a "functional (problem-free) working laptop." Doc. No. 48, at 8.) She concedes, however, that she has no direct proof of his knowledge of her protected activity (Jemmott Dep. 85), and Benesch testified that he did not know about it when Jemmott joined his team or when the decision to terminate her employment was made (Benesch Dep. 102). Similarly, Shelly Peterson and Travis Kraft both state in their Affidavits that the plaintiff's termination was not retaliatory, and there is no evidence in the record that they knew about Jemmott's participation in the fact-finding involving Becnel-Taylor.

The plaintiff insists that the investigation into Rouse's complaint about Becnel-Taylor, conducted by John McDonald, National Call Center Manager, and S. Tonna Mustian, Vocational Rehabilitation and Employment Officer, was biased and that Becnel-Taylor lied in describing the

encounter that led to the complaint. Whether the investigation was biased is simply irrelevant, however, because there is no evidence that Becnel-Taylor had anything to do with the plaintiff's termination. Moreover, it is undisputed that Becnel-Taylor moved into a different position at the end of April 2020 and was no longer supervising Benesch when the decision to terminate the plaintiff was made.

Mere speculation about the existence of a conspiracy, standing alone, does not constitute evidence sufficient to establish knowledge on the part of the relevant decision-makers. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). Because there is no competent evidence in the record from which it can reasonably inferred that any of the individuals who were responsible—Kraft, Peterson or Benesch—had knowledge of the plaintiff's protected activity, the plaintiff cannot establish the "knowledge" element of her *prima facie* case, or, accordingly, that there is a causal connection between her protected activity and her termination.

Because the plaintiff has not established a *prima facie* case, the court has no need to proceed with consideration of whether she can show that the proffered reason for her termination was prextextual. The defendant is entitled to summary judgment.

## V.   CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted and this case dismissed. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge